Brad Eric Scheler
Gary L. Kaplan
Andrew M. Minear
Sari J. Rosenfeld
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

*Attorneys for Richard Barker and Simon Edel as*
*Foreign Representatives of CX Reinsurance*
*Company Limited (in Administration)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
                                                                 :
*In re:*                                                         :   Chapter 15
                                                                 :
CX REINSURANCE COMPANY LIMITED (in                               :   Case No. 20-12156 (___)
Administration)                                                  :
                                                                 :
            Debtor in a Foreign Proceeding                       :
                                                                 :
---------------------------------------------------------------- x

**DECLARATION OF RICHARD BARKER AS FOREIGN REPRESENTATIVE OF CX**
**REINSURANCE COMPANY LIMITED IN SUPPORT OF ITS VERIFIED PETITION**
**FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND RELATED RELIEF**

I, Richard Barker, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am an associate partner with Ernst & Young LLP ("**EY**") and am a foreign

representative of CX Reinsurance Company Limited (in Administration) (the "**Company**") a

debtor in administration under Schedule B1 of the Insolvency Act of 1986 of England and Wales

(the "**Insolvency Act**" and such proceeding together with any ancillary, related, or subsequent

proceeding in England and Wales, the "**UK Proceeding**") pursuant to an order by the High Court

of Justice, the Business and Property Courts of England and Wales (the "**English Court**") dated

August 17, 2020 (and any amendments thereto, the "**Administration Order**").

2.       The Company was placed into the UK Proceeding, and Simon Edel, a partner at

EY, and I were appointed as joint administrators ("**Administrators**" each individually, an

"**Administrator**") and pursuant to that authority and the authority granted under the Insolvency

Act, we are the foreign representatives of the Company. A true and correct copy of the

Administration Order is attached hereto as **Exhibit A**. Pursuant to the terms of the Administration

Order, I am fully authorized to act as the foreign representative of the Company and commence

this chapter 15 case (the "**Chapter 15 Case**").

3.       I submit this declaration (this "**Declaration**") in support of the *Verified Petition for*

*Recognition of Foreign Main Proceeding and Related Relief* (the "**Chapter 15 Petition**"), filed

contemporaneously herewith seeking, among other things, recognition by this Court of the UK

Proceeding as a "foreign main proceeding" under section 1517 of title 11 of the United States

Code, §§ 101 *et seq.* (the "**Bankruptcy Code**") and certain related relief. This Declaration also

sets forth certain information required by section 1515(c) of the Bankruptcy Code and Rule

1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

4.       EY was engaged by the Company in early 2019 to assist the Company in

considering its options in relation to a possible scheme of arrangement. My involvement with the

Company began in June 2020 when the scope of EY's role was extended to prepare counterfactual

analyses for an insolvency in the event that the Company's regulators or policyholders would not

support the scheme of arrangement. Following further conversations in July 2020, the Company's

board of directors (the "**Board**") requested EY to assist with placing the Company into

2

administration and for Simon Edel and I to take appointment as Administrators subject to the

English Court approving the administration application.

5.      In the course of my duties as an Administrator of the Company, I have become

familiar with the Company's history, day-to-day operations, assets, financial condition, business

affairs and books and records. Except as otherwise indicated, all facts set forth in this Declaration

are based upon: (a) my personal knowledge; (b) my review of relevant documents; (c) information

supplied to me by other employees of EY under my supervision, the officers, directors, and

managers of the Company or other professionals retained by the Company or EY including, with

respect to matters of United States bankruptcy law, information provided to me by U.S. counsel;

or (d) my opinion based upon my experience and knowledge of the Company's operations and

financial condition. If I were called upon to testify, I could and would testify competently to the

facts set forth herein.

**BACKGROUND**

**A.      The Company's Business and Operations**

6.      The Company was incorporated in England and Wales on December 13, 1972 under

the name Continental Casualty Company Limited and was authorized as an insurance company by

the United Kingdom's Department of Trade & Industry on November 10, 1976.

7.      The Company's registered office is located at 1 More London Place, London, SE1

2AF and its administrative headquarters and principal place of business is at 1 Royal Exchange

Avenue, London EC3V 3LT. All of the Company's strategic decision-making and corporate

functions take place in London. Simon Edel and I, as Administrators, are now responsible for

managing the Company's affairs, business and property. We are officers of the English Court and

are subject to the English Court's control and supervision.

8.      The Company is authorized and regulated in England and Wales by the Prudential

Regulation Authority ("**PRA**") and the Financial Conduct Authority ("**FCA**").

9.      Prior to 2001, the Company underwrote an insurance and reinsurance portfolio

including international property and casualty, business and professional liability, medical

malpractice risks, errors and omissions risks, and directors and officer's risks.

10.      In August 2001, the Company ceased writing new business and since then has been

in solvent runoff. While in runoff, the Company has been managing the Company's existing

insurance and reinsurance policies, including settling creditor claims and collecting reinsurance

recoveries due from reinsurers.

11.      On October 31, 2002, Tawa PLC (f/k/a Tawa UK Limited) acquired the Company,

which, at the time, had an estimated $2.2 billion in gross undiscounted liabilities, of which more

than 50% arose in the United States. Tawa Associates Limited (collectively with Tawa PLC,

"**Tawa**") acquired the Company in 2014 in connection with a restructuring of Tawa PLC, and now

owns 100% of the Company's equity.

12.      After Tawa acquired the Company in 2002, the Company received over $10 million

in new equity from Tawa, the Company neither declared nor paid any dividends, and the Company

received over $35 million of new cash from the surrender of certain tax losses.

13.      From 2001 to December 2019, the Company reduced its liabilities from

approximately $2.2 billion to approximately $39 million through pro-active claims management.

The Company's remaining liabilities are divided evenly between its direct insurance business and

its reinsurance business.

14.      Despite such progress, however, the Company continues to face problems in

connection with paying its debts. Because the Company is a regulated insurance business in

England and Wales, it must meet certain capital requirements pursuant to EU Solvency II Directive (2009/138/EC) ("**Solvency II**"), including a solvency capital requirement ("**Solvency Requirement**"). To be compliant with its Solvency Requirement, the Company would need sufficient assets to have a 99.5% probability of satisfying all of its creditor's claims. And since Solvency II first came into effect in January 2016, the Company has been unable to meet its Solvency Requirement. Given the current reduced size of the Company's balance sheet, the Company could not conclude runoff on a solvent basis unless it were to materially reduce its current expenses, or, in the alternative, enter into an English scheme of arrangement or an insolvency proceeding. As a result, the PRA requested that the Company put together a plan to do so.

**B.      The Company's Assets and Liabilities in the United States**

15.      The Company's principal assets in the United States include investment assets in the amount of $35m held in accounts with State Street Bank (the "**Investment Assets**") and residual interests in two trusts established for the benefit of the Company's direct and reinsurance creditors (the "**Trust Assets**"). The Trust Assets include a surplus lines trust and a reinsurance trust, each of which are also held with State Street Bank and are regulated by the New York State Department of Financial Services (the "**New York Regulator**"). Simon Edel and I continue to work with the New York Regulator in connection with the UK Proceeding and this Chapter 15 Case.

16.      The Company also holds accounts with Barclays Bank PLC, who issued a letter of credit drafted on "evergreen terms" and tied to the Lead Paint Litigation (defined below) in favor of Liberty Mutual Insurance Company (the "**LOC**"). Collateral against the LOC includes a pledge against two of the Company's investment portfolios.

**C.      Events Leading to the UK Proceeding**

17.      In an effort to bring the runoff to conclusion, the Board considered several alternative strategies, and determined that a solvent scheme of arrangement would be in the best interests of all the Company's stakeholders because it would address actual and anticipated Solvency II capital breaches and end runoff on a solvent basis. In October 2019, the Company began preparations for a solvent scheme of arrangement and submitted the proposed solvent scheme of arrangement documentation to the PRA for review on May 1, 2020.

18.      The Board's proposed solvent scheme of arrangement ("**Solvent Scheme**") would have taken a bifurcated approach under which it would have (a) allocated sufficient assets to the Company's direct insurance book so it could meet its Solvency Requirement and, (b) as a result, transferred a portion or all the Company's direct insurance book to another risk carrier ("**Part VII Transfer**"). At the same time, the Solvent Scheme would have transferred the balance of the Company's assets to a trust. Reinsurance creditor claims would have then been subject to a one-time valuation and received payment from such trust. Given that there would have been insufficient trust assets remaining to pay reinsurance creditors' claims in full after accounting for assets allocated to the Company's direct book and operational costs of the runoff, the Solvent Scheme would have paid unsecured reinsurance creditors on a pro rata basis. After exhausting trust assets, the Solvent Scheme would have protected the Company's solvency by waiving any shortfall still owed to the unsecured reinsurance creditors. The Board thought this approach was fair because direct insurance creditors would have still been protected through the statutory priority waterfall applicable under the laws of England and Wales, and the Board believed the Company would, after satisfaction of the direct insurance creditors have been able to repay unsecured reinsurance creditors approximately 50-55% of their claims as valued under the proposed Solvent Scheme.

19.     On October, 2019, the Board began preparing for the Solvent Scheme and the Company adopted a policy under which it only made partial payments to the unsecured reinsurance creditors (for approximately 50% of the value of their claims) and paid direct insurance claims in full to avoid any preferential payments to unsecured reinsurance creditors while the Solvent Scheme was pending.

20.     On May 1, 2020, the Board submitted the Solvent Scheme documentation to the PRA for review and consideration with the goal to launch the Solvent Scheme by late July, 2020.

21.     Following a series of ongoing discussions with the PRA, the Board reviewed and re-assessed the risks arising out of certain litigation and determined to delay the Solvent Scheme. In particular, the Board was concerned about the Company's involvement in protracted lead paint litigation in the United States, which related to the Company seeking to rescind numerous policies issued to Baltimore landlords based on alleged policyholder misrepresentations at the time of underwriting (collectively, the "**Lead Paint Litigation**"). The Company is also party to 21 litigation matters pending in the United States, and a list of such cases is provided on a list annexed to the petition as **Schedule B.** Most of these actions are anticipated to be settled, however, resolution of the Lead Paint Litigation remains uncertain, including its duration and overall economic impact.

22.     Uncertainty surrounding the Lead Paint Litigation was one of several risks that ultimately led the Board to delay the launch of the Solvent Scheme. The Board also considered risks associated with potential deterioration of the Company's investments, cost of undertaking the Solvent Scheme and uncertainty surrounding the other liabilities of the Company and whether a subsequent Part VII Transfer would ever be achievable.

23.      The Board then determined that the risks of implementing the Solvent Scheme would outweigh the benefits, and that they would therefore need to consider alternative options. The Board next considered an alternative reduced cost runoff plan, under which the Company would reduce costs and expenses to a minimum, while the Company would subsequently maintain payments to direct and reinsurance creditors, as they would arise (the "**Reduced Cost Runoff Plan**"). The Board ultimately concluded that the Reduced Cost Runoff Plan, although the only means for preserving the Company's solvency, would fail to meet the PRA's expectations of a regulated insurance company.

**D.      The UK Proceeding**

24.      In recent months, the Board decided that it would not be appropriate to proceed with the Solvent Scheme, and that instead, an administration under the laws of England and Wales would provide the best outcome for the Company's creditors as a whole in circumstances where the Company is unable to pay its debts as they fall due. The Board has also determined that until the Lead Paint Litigation is resolved, no plan to wind up the Company could be successful. As a result, the Company has now ceased all payments to unsecured insurance and reinsurance creditors to mitigate the risk of making preferential payments in contravention of the priority waterfall applicable in the UK Proceeding. The Board further determined that placing the Company into administration would provide it with the necessary "breathing room" in order to resolve certain large uncertainties on its balance sheet and ultimately facilitate the Company's wind down. Consequently, on August 17, 2020, the Company entered into the UK Proceeding pursuant to the Administration Order.

25.      The UK Proceeding imposes a statutory moratorium similar to the Bankruptcy Code's automatic stay. The moratorium aims to provide Simon Edel and I as the Administrators,

8

with the necessary breathing room to formulate proposals with respect to the Company, its creditors, and its assets without the Company being subject to new or continuing litigation or claims.

26.    However, the UK Proceeding and therefore the moratorium does not have extra-territorial effect in a foreign country. As discussed above, the Company's Trust Assets and Investment Assets are located in the United States. In addition, many of the Company's creditors, including the plaintiffs in the Lead Paint Litigation, are located in the United States.

27.    Simon Edel and I, in our capacity as foreign representatives of the Company, are now commencing this Chapter 15 Case in order to preserve the Company's assets in the United States, to give effect to the Company's UK Proceeding in the United States, and to ensure the orderly management of the Company's affairs by the Administrators in England and Wales as well as in the United States.

## **CONCLUSION**

28.    Based on the foregoing, I believe that the relief requested in the Chapter 15 Petition is justified and necessary under the circumstances, in the best interests of the Company and its stakeholders and should be granted in full.

I certify pursuant to 28 U.S.C § 1746 under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct to the best of my knowledge,

information and belief.

Dated: September 14, 2020
        London, England

_____

Richard Barker
Joint Administrator
CX Reinsurance Company Limited (in
Administration)

## EXHIBIT A

## Administration Order

# Administration order

### IN THE MATTER OF THE INSOLVENCY ACT 1986

**Rule 3.13, IR 2016**

(a) This order is prepared for a company incorporated within England and Wales. If the company is incorporated outside the UK or is an unregistered company refer to rule 1.6 for identification requirements. (Rules 3.13(1) and 1.6.)

(aa) The introductory paragraph is not required but is included for convenience of the intended recipients and may be considered immaterial but permitted. (Rule 1.9.)

(b) Insert name and title of the judge making the order. (Rule 3.13(1)(b).)

(bb) Insert date of the administration order and, if the court so orders, the time. (Rule 3.13(1)(j).) Including the date of the order at this position in the document may be considered more convenient for the intended recipients and as such permitted under Rule 1.8(2).

(c) Insert name of applicant.

(cc) Insert status of applicant. Insert applicant's address for service. Rule 3.13 does not require the identity of the applicant and their locus to make the application to be stated but to do so may be considered convenient for the intended recipient. (Rules 3.13(1)(c) and 1.8(2).)

(d) Insert details of any other parties (including the company) appearing and by whom represented. (Rule 13.13(1)(d).)

(e) Insert full name(s) of administrator[s].
If a single administrator is appointed delete as applicable. (Rule 3.13(1)(f).)

(f) This paragraph is required where more than one administrator is appointed and should be amended as applicable (Rule 3.13(2) and paragraph 100(2) Schedule B1.)

(g) Insert details of any other orders or provisions made by the court. (Rule 3.13(1)(k).) Sub-rule 3.13(1)(k) requirements are listed here ahead of sub-rule 3.13(1)(h) and (i) as it may be considered more convenient for the recipient to have details of the court's orders grouped. If the court makes an order under sub-paragraph (d) or (f) of paragraph 13(1) of Schedule B1 insert details of directions given by the court as to the persons to whom and how notice of the order is to be delivered.(Rule 3.15(3).)

(h) Insert whether the EU Regulation applies.

(hh) If the EU Regulation does apply identify whether the proceedings are main, secondary or territorial proceedings. (Rules 3.13(1)(h), (i) and 1.2.)

(i) Insert additional requirements of rule 3.14 in the case of an application under paragraph 37 or 38 to Schedule B1 (i.e. applications where the company is in liquidation.) (Rule 3.14.)

IN THE MATTER OF

CX REINSURANCE COMPANY LIMITED.

(a) Company registered number
01086556

CR-2020-003307

In the High Court of Justice
Business and Property Courts of England and Wales
Insolvency and Companies List (ChD)

Court case number
CR-2020-003307

**(aa) This order is made in accordance with the requirements of rule 3.13 of the Insolvency (England and Wales) Rules 2016 (IR 2016) and Schedule B1 of the Insolvency Act 1986 (respectively Schedule B1 and IA 1986.) References in this order to rules are, unless expressly provided otherwise, references to the rules of the IR 2016.**

**1**. This administration order is made by (b) ICC Judge Mullen on (bb) 17 August 2020 at 10:58am

**2**. The application for an administration order was made by (c) William John Bower, Simon Lees-Buckley Byrne, Gilles Marie Jacques Erulin, Paul Andrew Jardine, Marvin David Mohn and David Andrew Vaughan whose address for service is: (cc) c/o Stevens & Bolton LLP, Wey House, Farnham Road, Guildford, Surrey, GU1 4YD (Ref: DJS.LAT.CX.0001.2), represented by Adam Goodison of Counsel.

**3** The Court ORDERS that:

- During the period for which this order is in force the affairs, business and property of the company is to be managed by the administrators.

- (e) Richard Barker and Simon Edel of Ernst & Young LLP, (together, the Administrators) are appointed administrators of the company.

- (f) For the purposes of paragraph 100 (2) to Schedule B1 the Administrators may exercise any of the powers conferred on them by the IA 1986 jointly or individually.

- (g) The applicants' costs of the application be paid as an expense of the administration.

**4** (h) The Court is satisfied that the EU Regulation does not apply.